UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | |
|---|---|
| **MARSHA G. LOGAN** | **CIV. ACTION NO. 5:20-00988** |
| **VERSUS** | **JUDGE S. MAURICE HICKS, JR.** |
| **KILOLO KIJAKAZI, ACTING COMMISSIONER, U.S. SOCIAL SECURITY ADMINISTRATION** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

**REPORT AND RECOMMENDATION**

Before the court is Plaintiff Marsha Logan's petition for review of the Commissioner's denial of social security disability benefits. The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice.

**Background & Procedural History**

Logan protectively filed the instant application for Title XVI supplemental security payments on December 6, 2018. (Tr. 68, 171-176).[1] Logan, who was 61 years old at the time of the administrative hearing, asserted an amended disability onset date of December 16, 2018, because of high blood pressure, ankle swelling, cataracts, plus pain in her left leg and bilateral shoulders. (Tr. 29, 185, 189). The state agency denied the claim initially on January 31, 2019,

---

[1] Logan filed a prior application for disability benefits on February 11, 2014. (Tr. 71). The claim was denied at the ALJ hearing level on February 19, 2015, and the Appeals Council denied review on May 5, 2016. *Id*. Logan filed another disability application on August 26, 2016, which was denied by an ALJ on April 27, 2018, and request for review denied by the Appeals Council on November 20, 2018. (Tr. 47-58, 62-67).

and upon reconsideration on May 2, 2019. (Tr. 68-98, 103-106). Thereafter, Logan requested and received a January 28, 2020 hearing before an Administrative Law Judge ("ALJ"). (Tr. 25-46). In a February 20, 2020 written decision, the ALJ determined that Logan was not disabled under the Social Security Act, finding at step five of the sequential evaluation process that she was able to make an adjustment to work that exists in significant numbers in the national economy. (Tr. 7-19). Logan appealed the adverse decision to the Appeals Council. On June 8, 2020, however, the Appeals Council denied Logan's request for review; thus, the ALJ's decision became the final decision of the Commissioner. (Tr. 1-3).

On August 3, 2020, Logan filed the instant, pro se complaint for judicial review of the Commissioner's final decision. Following submission of the administrative transcript and supporting memoranda, the matter is now before the court.

### **Standard of Review**

This court's standard of review is (1) whether the final decision is supported by substantial evidence, and (2) whether the Commissioner applied the proper legal standards to evaluate the evidence. *Keel v. Saul*, 986 F.3d 551, 555 (5th Cir. 2021) (citation omitted). The Supreme Court has emphasized that

> [t]he phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, ___ U.S. ___, 139 S.Ct. 1148, 1154 (2019) (internal citations omitted). The reviewing court may not reweigh the evidence, try the issues *de novo*, or

substitute its judgment for that of the Commissioner. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).

Upon finding substantial evidence, the court may only review whether the Commissioner has applied proper legal standards and conducted the proceedings consistently with the statute and regulations. *Carter v. Heckler*, 712 F.2d 137, 140 (5th Cir. 1983). In other words, where the Commissioner's decision is supported by substantial evidence, the findings therein are conclusive and must be affirmed – *unless* the Commissioner applied an incorrect legal standard that materially influenced the decision. *See* 42 U.S.C. § 405; *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000); *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001).

**Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability. *See* 42 U.S.C. ' 423(a)(1)(D). The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . ." 42 U.S.C. ' 423(d)(1)(A). A disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA. *See* 20 C.F.R. ' 404.1520(a)(4)(ii). Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work. *See* 42 U.S.C. ' 423(d)(2)(A).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA. *See* 20 C.F.R. " 404.1520, 416.920. The steps are as follows,

(1) An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

(2) An individual will be found not disabled if he or she does not have a "severe impairment," or a combination of impairments that is severe, and of the requisite duration.

(3) An individual whose impairment(s) meets or equals a listed impairment in [20 C.F.R. pt. 404, subpt. P, app. 1], and meets the duration requirement, will be considered disabled without the consideration of vocational factors.

Before proceeding to step four, the Commissioner assesses the individual's residual functional capacity, which is used at both step four and step five to evaluate the claim.

(4) If an individual's residual functional capacity is such that he or she can still perform past relevant work, then a finding of "not disabled" will be made.

(5) If an individual is unable to perform past relevant work, then other factors including age, education, past work experience, and residual functional capacity must be considered to determine whether the individual can make an adjustment to other work in the economy. If the individual can make such an adjustment, then he or she will be found not disabled. If the individual is unable to adjust to other work, then he or she will be found disabled.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001); 20 C.F.R. '§ 404.1520, 416.920.

When a finding of "disabled" or "not disabled" may be made at any step, a decision will be rendered at that point without proceeding to the remaining steps. 20 C.F.R. '§ 404.1520, 416.920; *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990). "The claimant bears the burden of proof on the first four steps, but the Commissioner bears the burden on the fifth

4

step." *Salmond v. Berryhill*, 892 F.3d 812, 817 (5th Cir. 2018) (citation omitted).

## The ALJ's Findings

**I.       Steps One, Two, and Three**

The ALJ determined at step one of the sequential evaluation process that the claimant did not engage in substantial gainful activity during the relevant period. (Tr. 12-13). At step two, he found that the claimant suffered severe impairments of mild osteoarthritis of the right knee; status post iliotibial band; hypertension; hyperthyroidism; anemia; and sickle cell trait. *Id.*[2] He concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process. (Tr. 14-15).

**II.      Residual Functional Capacity**

The ALJ next determined that the claimant retained the residual functional capacity ("RFC") to perform medium work,[3] except that she could only frequently stoop, crouch, crawl

---

[2] The ALJ further determined that the claimant's medically determinable impairments of cataracts, hypertensive retinopathy, carpal tunnel syndrome, and depression were not severe. *Id.*

[3] Medium work is defined and explained by Social Security Ruling 83-10:

> [t]he regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds. As in light work, sitting may occur intermittently during the remaining time. Use of the arms and hands is necessary to grasp, hold, and turn objects, as opposed to the finer activities in much sedentary work, which require precision use of the fingers as well as use of the hands and arms.

and kneel; only occasionally climb ladders, ropes, or scaffolds; frequently climb stairs and ramps; and only occasionally balance on narrow or moving surfaces, but frequently balance on level surfaces. (Tr. 15- 19).

### III.    Steps Four and Five

The ALJ determined at step four of the sequential evaluation process that the claimant had no past relevant work. (Tr. 18-19). Accordingly, he proceeded to step five. At this step, the ALJ determined that the claimant was an individual closely approaching retirement age, with a high school education, and the ability to communicate in English. *Id*. Transferability of skills was not material to the decision. *Id*.

The ALJ next observed that given the claimant's vocational factors, and if she had an RFC that did not include any non-exertional limitations, then the Medical-Vocational Guidelines would direct a finding of not disabled. 20 C.F.R. §§ 404.1569, 416.969; Rule 203.06, Table 3,

---

> The considerable lifting required for the full range of medium work usually requires frequent bending-stooping. (Stooping is a type of bending in which a person bends his or her body downward and forward by bending the spine at the waist). Flexibility of the knees as well as the torso is important for this activity. (Crouching is bending both the legs and spine in order to bend the body downward and forward). However, there are a relatively few occupations in the national economy which require exertion in terms of weights that must be lifted at times (or involve equivalent exertion in pushing or pulling), but are performed primarily in a sitting position, e.g., taxi driver, bus driver, and tank-truck driver (semi-skilled jobs). In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

*Social Security Ruling 83-10*: TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK--THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2 (SSR 83-10).

6

Appendix 2, Subpart P, Regulations No. 4; Tr. 18-19. However, because the claimant's RFC *did* include non-exertional limitations, the ALJ consulted a vocational expert ("VE") to determine whether, and to what extent the additional limitations eroded the occupational base for work. *Id*. In response, the VE identified the representative jobs of **Industrial Cleaner**, *Dictionary of Occupational Titles* ("DOT") Code # 381.687-018; **Dishwasher**, DOT # 318-687-010; and **Hand Packager**, DOT # 920.587-018, that were consistent with the ALJ's RFC and the claimant's vocational profile. (Tr. 18-19, 44).[4]

## Analysis

Pursuant to the court's scheduling order, plaintiff was required to submit a brief that *inter alia*, set forth "**specific errors** committed at the administrative level which entitle plaintiff to relief." (March 2, 2021 Sched. Order [doc. # 14]). The order cautioned that "[t]he court will consider only those errors **specifically identified** in the briefs. A general allegation that the ALJ's findings are unsupported by substantial evidence, standing alone, is insufficient to invoke the appellate function of the federal court." *Id*.

In her appeal brief to this court, Logan stated that she disagreed with the Commissioner's decision and recited her impairments. (Pl. Brief [doc. # 16]). She also noted that she no longer was working. *Id*. Logan emphasized that she "totally" disagreed with Dr. Kalaria's opinion that she could sit, stand, and walk for eight hours. *Id*. Logan further explained that she could not lift more than 50 pounds because after her hysterectomy in 1998, the surgeon instructed her

---

[4] The VE responded that for the industrial cleaner, dishwasher, and hand packager jobs there were 12,129; 279,218; and 39,852 positions available nationwide, respectively. (Tr. 18-19, 44). This incidence of work constitutes a significant number (and range) of jobs in the "national economy." 42 U.S.C. § 423(d)(2)(A); *Johnson v. Chater*, 108 F.3d 178, 181 (8th Cir. 1997) (200 jobs at state level and 10,000 nationally, constitute a significant number).

not to lift more than fifteen pounds. *Id.*[5] Logan concluded her argument by adding an ear allergy to her list of medical conditions. *Id.*

From what the court may discern by way of Logan's memoranda, she principally challenges the ALJ's residual functional capacity assessment ("RFC"). Logan also urges the court to retrieve her medical records from 1998 and consider her new ear allergy impairment. The court will address these arguments, in turn.

**I.     RFC**

The relevant period at issue in this case spans roughly fourteen months from the amended disability onset date of December 16, 2018, until the date of the ALJ's decision on February 20, 2020. The medical treatment records that influence the relevant period are relatively benign. For example, on June 12, 2018, Logan saw Tilak Kalaria, M.D., for routine follow-up and to obtain residual functional capacity paperwork for purposes of disability. (Tr. 434-436). Dr. Kalaria advised Logan that she did not appear to meet any disability requirements, and so she likely would be denied. *Id.* Logan had no other complaints that day. *Id.* Dr. Kalaria's assessment included diagnoses for well-controlled major depressive disorder, hyperthyroidism, and essential hypertension. *Id.*

Dr. Kalaria obliged Logan's request and dutifully completed a residual functional capacity form on her behalf. (Tr. 263-266, 396-399, 492-495). The form was dated June 12, 2018, and indicated that Logan could sit and/walk for about eight hours in an eight-hour workday. *Id.* She also could stand/walk for up to two hours at a time before needing to change

---

[5] In her reply brief, Logan clarified that Dr. Sanders was the physician who told her not to lift more than fifteen pounds. (Pl. Reply Brief [doc. # 18]).

positions, i.e., sit or lie down. *Id*. She needed flexibility to change positions on an occasional basis. *Id*. Dr. Kalaria attributed these limitations to Logan's stress and anxiety. *Id*.

Kalaria further indicated that Logan could continuously carry and lift up to 50 pounds, and occasionally lift up to 100 pounds. *Id*. Pushing/pulling, grasping, and fine manipulation were unlimited. *Id*. She also was able to continuously bend, climb, reach overhead, and stoop, but only occasionally squat, crawl, and kneel. *Id*. Dr. Kalaria limited Logan to occasional extreme temperature changes and occasional exposure to dust, fumes, gas, smoke, etc. *Id*. Although Logan could be expected to experience chronic pain, it remained mild and would not affect her ability to perform any particular activity. *Id*. Kalaria noted that Logan needed occasional unscheduled interruptions to leave the work station to stretch. *Id*. She also would need to occasionally miss work because of exacerbation of pain or other symptoms. *Id*. Nonetheless, Dr. Kalaria indicated that Logan would be a reliable worker and anticipated that, over time, her pain would not be a limiting factor at all. *Id*.

On August 13, 2018, Logan complained of moderate right shoulder pain that started about three weeks earlier. (Tr. 427-429). However, there was no numbness, muscle weakness, or tingling. *Id*. She was diagnosed with shingles. *Id*.

On January 25, 2019, Logan went to Ochsner Health Shreveport with complaints of finger numbness to both hands for more than nine months. (Tr. 470-472). The pain and numbness caused her to wake up at night, and she had to shake her hands to relieve symptoms. *Id*. Logan, however, denied decreased grip strength and demonstrated 5/5 grip strength bilaterally. *Id*. She also had normal range of motion in both hands, with only mildly decreased sensation on the left hand. *Id*. Her symptoms were consistent with bilateral carpal tunnel

9

syndrome. *Id*. The provider recommended over the counter anti-inflammatory medicine and nightly wrist splints. *Id*.

On January 31, 2019, non-examining agency psychologist, James Pinkston, Ph.D., reviewed the record and opined that Logan's depressive disorder was not severe. (Tr. 77). Also on January 31, 2019, non-examining agency physician, Hollis Rogers, M.D., reviewed the record and opined that Logan's physical impairments were not severe. (Tr. 75-76).

On February 22, 2019, Logan went to the emergency room for complaints of right-side flank pain when she twisted her body, plus neck pain when she turned her head. (Tr. 477-480). Upon examination, however, she had a normal range of motion, strength, and reflexes. *Id*. She was diagnosed with muscle spasms. *Id*.

On May 1, 2019, non-examining agency physician, James Crout, M.D., reviewed the record and affirmed Dr. Rogers' prior finding that Logan's physical impairments were not severe. (Tr. 89-90). Likewise, on May 2, 2019, non-examining agency psychologist Margaret Hauk, Ph.D., reviewed the record and affirmed Dr. Pinkston's prior determination that Logan's depression was not severe. (Tr. 91).

On May 21, 2019, Logan saw Malti Bhamrah, M.D., at Oschsner-LSU for follow-up. (Tr. 537-540). Overall, Logan was feeling well., but continued to experience lower extremity cramping, especially at night. *Id*. Nonetheless, she denied numbness/weakness in the extremities and was negative for muscle and joint pains. *Id*. She exhibited full strength in the major muscle groups bilaterally, with intact sensation. *Id*. Dr. Bhamrah diagnosed lower extremity cramping; major depressive disorder – well controlled, without depressive symptoms; and essential hypertension. *Id*.

At a June 10, 2019 follow-up for retinal atrophy, Allen Gu, M.D., documented that Logan was happy with her glasses and had 20/20 vision in both eyes. (Tr. 509-511, 544-545). Her peripheral retinal atrophy was asymptomatic. *Id*.

On November 26, 2019, Logan saw Derek Rainwater, M.D., for chronic disease management. (Tr. 560-562). She had no complaints at that time and endorsed compliance with all her medications. *Id*. Her bilateral leg cramping had resolved. *Id*. She was negative for arthralgias. *Id*. Dr. Rainwater diagnosed hypertension and microcytosis. *Id*.

In his decision, the ALJ reviewed the available evidence, including the hearing testimony, Logan's activities of daily living, treatment records, the statement from Logan's treating physician, and the impressions of the agency physicians. (Tr. 15-17). While the non-examining agency consultants opined that Logan had no severe mental or physical impairment at all, the ALJ acknowledged some of the limitations recognized by Dr. Kalaria.

The court recognizes that for claims filed on or after March 27, 2017, the Commissioner no longer affords "controlling weight" to the opinions of treating physicians and will not defer or give any specific evidentiary weight to any medical opinion(s) from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a) and 416.920c(a). Furthermore, the fact that a medical source actually examined the claimant or specializes in an area germane to the claimant's medical issues are not primary or dispositive considerations in assessing the medical opinion. *See* 20 C.F.R. §§ 404.1520c(c) and 416.920c(c). Rather, when determining the persuasiveness of a medical opinion, the most important factors are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2) and 416.920c(b)(2). Only when two or more medical opinions about the same issue are both equally well-supported and consistent with the record, but "not exactly the same," then the Commissioner will articulate how she considered the "other most persuasive

factors," such as the medical source's relationship with the claimant (including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and the examining relationship); the medical source's specialization; and other factors (including a medical source's familiarity with other evidence of the claim or an understanding of the agency's disability program's policies and evidentiary requirements).  20 C.F.R. §§ 404.1520c(b)(3)-(c) and 416.920c(b)(3)-(c).

Here, the ALJ found that the assessments of the non-examining agency consultants were persuasive because they were consistent with the objective medical record.  (Tr. 17).  He further found that the Dr. Kalaria's assessment was partially persuasive, to the extent it was consistent with the ALJ's own findings.  *Id*.  However, the ALJ expressly determined that Dr. Kalaria's recognition of environmental limitations was unsupported by the record.  *Id*.  While the ALJ did not specifically discount Dr. Kalaria's opinion that Logan could only occasionally squat, crawl, or kneel, any such error was harmless because at least one of the jobs (hand packager) identified by the vocational expert did not require any of those activities.  *See* DOT 920.587-018, 1991 WL 687916.[6]

The court also observes that Dr. Kalaria indicated that Logan would need occasional unscheduled interruptions to alleviate pain.  (Tr. 265-266).  However, Kalaria noted that the purpose of the interruption was to stretch, which he earlier characterized as a need to change positions.  (Tr. 263).  There is no indication that this stretching and repositioning could not be

---

[6] "Procedural perfection in administrative proceedings is not required."  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).  Procedural improprieties "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988); *see also Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (ALJ's omission does not require remand unless it affected claimant's substantial rights).

performed at the workstation or during the normal breaks available throughout the workday.[7]

Kalaria also remarked that Logan occasionally would have to miss work because of exacerbation of pain or other symptoms. (Tr. 265). However, Kalaria did not document the frequency of missed work, and there is nothing to suggest that he was familiar with the agency's definition of "occasional." To the contrary, Dr. Kalaria characterized Logan as a reliable worker and even candidly explained to Logan that she did not appear to meet disability requirements.

With respect to Logan's argument that "Dr. Sanders" restricted her from lifting more than 15 pounds in 1998 following a hysterectomy, there is nothing to suggest that Dr. Sanders intended for this limitation to be open-ended or perpetual, rather than for a finite period of time while she recovered from the surgery. Certainly, neither Dr. Kalaria, nor any other physician of record for the period at issue, believed that Logan was subject to any significant lifting restriction of ongoing duration. Furthermore, the court is not at liberty to order production of medical records from Dr. Sanders. First, it is plaintiff's burden to establish disability. Second, the court's review ordinarily is limited to evidence in the existing administrative record.

Likewise, insofar as Logan intended for the court to consider her alleged new ear allergy impairment, there is no evidence of any such impairment in the administrative record. Moreover, the relevant period subject to review extends only through the date of the ALJ's decision. Accordingly, the ear allergy appears to be a "later-acquired disability or . . . the subsequent deterioration of the previously non-disabling condition." *Haywood v. Sullivan*, 888 F.2d 1463, 1471-1472 (5th Cir. 1989) (quoting *Johnson v. Heckler*, 767 F.2d 180, 183 (5th

---

[7] Dr. Kalaria is not a vocational expert and, thus, unlikely to be acquainted with typical job requirements and number of rest breaks.

13

Cir.1985) (internal quotation marks omitted)). Either way, the new impairment does not provide a basis for relief on the present application.

Ultimately, the ALJ reduced Logan's RFC to a limited range of medium work. Logan, however, maintains that the ALJ did not go far enough, and, in support, relies on her own self-professed limitations of functioning. Nonetheless, the ALJ determined that Logan's statements concerning the intensity, persistence and limiting effects of her symptoms were not fully consistent with the medical evidence. (Tr. 17). In the end, where the objective medical evidence and the opinions of the medical professionals collided with Logan's own testimony and self-described limitations, the ALJ credited the former. This credibility determination falls well within the ALJ's discretion and is supported by substantial evidence. Accordingly, the court discerns no reversible error associated with the ALJ's RFC assessment. Logan raised no errors with respect to any other step of the sequential evaluation process.

## Conclusion

The ALJ in this case was tasked with determining whether the claimant was disabled. In so doing, he considered the hearing testimony, the medical records, and expert opinion evidence. The evidence was not necessarily uniform, and according to Logan, should have compelled a different result. However, conflicts in the evidence are for the Commissioner to resolve. *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted). **This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."** *Newton, supra* (emphasis added). Rather, the limited dual inquiry presented is whether the Commissioner's determination that Logan was not disabled under the Social Security Act is supported by substantial evidence

and free of legal error. Upon review of the arguments, the court is satisfied that the Commissioner's decision comports with the foregoing standard. Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before a final ruling issues.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 7th day of September, 2021.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE